*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* K.Q. FRIERSON, Minor.

UNPUBLISHED
September 12, 2025
10:04 AM

No. 374398
Kalamazoo Circuit Court
Family Division
LC No. 2021-000214-NA

Before: SWARTZLE, P.J., and GARRETT and YATES, JJ.

PER CURIAM.

Petitioner, the Department of Health and Human Services (the Department), sought termination of respondent-mother's parental rights to her three children because of domestic violence that placed the children at substantial risk of harm. Respondent-mother appeals by right the trial court's order terminating her parental rights to KF[1] under MCL 712A.19b(3)(c)(*i*) (failure to rectify conditions that led to adjudication), MCL 712A.19b(3)(g) (failure to provide proper care when financially able to do so), and MCL 712A.19b(3)(j) (reasonable likelihood of harm to the child).[2] Respondent-mother challenges the trial court's findings with respect to the statutory grounds for termination and KF's best interests. Finding no error, we affirm the termination order.

## I. RELEVANT FACTS AND PROCEEDINGS

The Department petitioned for the removal of KF and KF's two siblings from respondent-mother's home because of ongoing domestic violence. The petition alleged that respondent-father threatened respondent-mother with a gun in a child's presence, which led to respondent-father's arrest. Respondents stipulated to probable cause at the preliminary hearing, and the children were placed with respondent-mother. The trial court authorized the petition, ordered respondent-mother to cooperate with the Department with respect to services, ordered her to allow the Department

---

[1] Respondent-mother's parental rights to the other two children were not terminated. Rather, one child was placed with her paternal grandmother, and the other child was placed with his maternal grandfather. This appeal pertains to KF only.

[2] The court also terminated the parental rights of KF's father, but he is not a party to this appeal.

and the lawyer-guardian ad litem access to her home, and ordered the parties not to have contact. At their adjudication in January 2022, respondents admitted to ongoing domestic violence that placed the children at substantial risk of harm. The trial court found by a preponderance of the evidence that the material allegations in the petition were true and that the children came within the trial court's jurisdiction under MCL 712A.2(b). Therefore, the court accepted respondents' pleas of admission and assumed jurisdiction. An initial disposition was held in February 2022, after which the trial court entered an order continuing, among other things, the children's placement with respondent-mother and the no-contact order between respondents.

Shortly after the disposition hearing, the Department filed a supplemental petition alleging that an act of domestic violence occurred on February 20, 2022. The petition alleged that respondent-father went to respondent-mother's home and that respondent-mother allowed him in the home despite the trial court's no-contact order. An argument ensued, during which respondent-mother slapped respondent-father and took his phone. Respondent-father then got on top of respondent-mother and began strangling her. The children walked in to see respondent-father with his hands around respondent-mother's neck. The oldest child called the police. Two days later, the children reported that they were afraid to be at home because of respondents' continued domestic violence. The trial court ordered that the children be taken into protective custody.

Throughout 2022 and 2023, respondent-mother engaged in services, including therapy and parenting classes, and made progress in addressing domestic-violence issues. Despite this, she continued to have contact with respondent-father in violation of the trial court's no-contact orders as well as a personal protection order (PPO) that she obtained against respondent-father. In May 2022, respondent-mother went to the home where respondent-father lived with his girlfriend and her parents to retrieve a firearm. Because of an altercation, the police were called, and respondent-father was arrested. The trial court repeatedly emphasized that respondents should have no contact with each other. Following an October 2022 review hearing, the trial court entered an order allowing the staggered return of the children to respondent-mother, beginning with KF. In December 2022, however, KF was again removed from respondent-mother's care because respondents violated the no-contact order: respondent-father was seen driving respondent-mother's car with both respondent-mother and KF in the car.

In August 2023, on the Department's recommendation, the trial court again ordered KF's return to respondent-mother's care. A week later, the Department moved for a placement hearing, alleging that respondent-mother contacted respondent-father via Facebook Messenger, in violation of the no-contact order. A week after that, the Department filed another motion for a placement hearing after it learned that respondent-mother took KF to respondent-father's residence to play with the children there despite the no-contact order. Following a hearing on the Department's motions, the trial court entered an order again removing KF from respondent-mother's care and placing her with the Department for care and supervision.

At a permanency-planning hearing in May 2024, the caseworker's supervisor, Ashley Garza, testified that the Department had been prepared to recommend continued efforts at reunification. However, the Department had just learned of a PPO violation in March 2024 and another PPO violation more recently. Respondent-mother did not report the violations, even though her safety plan required her to do so. Because the information was new to the Department and the caseworker had not had a chance to review it, Garza asked to adjourn the permanency-

planning portion of the hearing to give the Department more time to evaluate the situation and consider how to proceed. The court denied the request and instead instructed the Department to initiate proceedings to terminate respondent-mother's parental rights and change the permanency-planning goal to adoption.

In accordance with the trial court's order, the Department petitioned to terminate respondents' parental rights, citing ongoing issues involving domestic violence and the inability to provide a safe environment for KF. During the termination hearing, it was discovered that respondent-mother had continued contact with respondent-father, undermining her progress in therapy and her ability to provide a stable home. Two foster-care workers indicated that ongoing contact between respondents was a significant, unresolved barrier to reunification and that KF needed the stability and permanency that would allow her to address the trauma she had suffered as a result of the domestic violence and her repeated removals from caretakers. Respondent-mother's current therapist, Cindy Thomas, testified that she began treating respondent-mother in February 2024 and that respondent-mother was doing very well. Thomas believed that respondent-mother had been very open about her past and her desire to move forward and that she had progressed in her ability to manage trauma triggers, to recognize and process "red flags," and to build self-esteem. It became apparent on cross-examination, however, that Thomas was unaware of respondent-mother's most recent contacts with respondent-father and of the number of times KF had been removed from her care.

Respondent-mother testified that she had been in a relationship with respondent-father for nine years, during most of which she experienced physical and mental abuse. She indicated that her previous therapists had not suited her, and that Thomas was the first therapist who worked with her on the traumatic effects of domestic violence. Respondent-mother expressed a strong desire to move on from her past with respondent-father and maintained that she would not return to a relationship with him. She could not explain why she stayed with him or kept going back to him, but claimed that she had a different perspective at that point and different "supports" in her life. She said that she would continue therapy, regardless of the outcome of the termination hearing, and focus on loving herself, being strong and independent, and not being fearful; she was happy before the relationship, and she wanted to get back to being herself. She did not want the abusive relationship between she and respondent-father to affect KF for the rest of her life. Respondent-mother said that she would participate in any specific program that the trial court or her caseworker recommended to assist her to help KF address her trauma. She admitted past violations of the trial court's no-contact order, attributing them to respondent-father's manipulation and the state of her mental health. She also acknowledged that she had been dishonest about her contacts with respondent-father, but maintained that she had never tried to trick the court. Respondent-mother admitted accepting phone calls from respondent-father while he was in jail after a very violent physical assault that he perpetrated on her at a gas station in May 2024, but she insisted that she was trying to end contact with him.

Ruling from the bench, the trial court found clear and convincing evidence to terminate respondent-mother's parental rights under MCL 712A.19b(3)(c)(*i*), (3)(g), and (3)(j). The court also concluded that termination was in KF's best interests given the child's extensive needs resulting from trauma, the treatment recommended following her trauma assessment, and her need for a stable home environment. Consequently, the court entered an order terminating respondent-mother's parental rights to KF. Respondent-mother now appeals.

## II. STATUTORY GROUNDS

Respondent-mother first argues that the trial court clearly erred by finding that clear and convincing evidence established the statutory grounds to terminate her parental rights. We review for clear error the court's determination whether clear and convincing evidence supports a ground for termination. *In re Trejo Minors*, 462 Mich 341, 356-357; 612 NW2d 407 (2000). See also MCR 3.977(K). A finding is clearly erroneous if, although some evidence supports it, we are left with a definite and firm conviction that a mistake was made. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). "To be clearly erroneous, a decision must strike us as more than just maybe or probably wrong." *In re Sours*, 459 Mich 624, 633; 593 NW2d 520 (1999) (quotation marks and citation omitted). In addition, we give regard to the trial court's special opportunity "to judge the credibility of the witnesses who appeared before it." *In re Ellis*, 294 Mich App 30, 33; 817 NW2d 111 (2011). We defer to the trial court's factual findings unless they are clearly erroneous. *In re Rood*, 483 Mich 73, 90; 763 NW2d 587 (2009). If the trial court did not clearly err by finding that the evidence supported one statutory ground for termination, then this Court should affirm the termination of parental rights. *In re Sanborn*, 337 Mich App 252, 273; 976 NW2d 44 (2021).

Termination of parental rights under MCL 712A.19b(3)(c)(*i*) is appropriate when "182 or more days have elapsed since the issuance of an initial dispositional order," and the trial court finds by clear and convincing evidence that "[t]he conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." It is undisputed that more than 182 days elapsed between the initial dispositional order in February 2022 and the termination order in October 2024. The trial court determined that, although respondent-mother was making progress and would hopefully move on without respondent-father in her life, she was not at the point that she was able to parent KF and provide a safe and stable home environment for her. The record supports the trial court's determination.

The trial court correctly acknowledged that this is a difficult case. Respondent-mother testified that she would not contact respondent-father, that respondent-father did not know where she lived, and that her work colleagues knew to call the police if he showed up on the property. However, the trial court found that it was too soon to conclude that domestic violence was no longer a barrier to reunification. Respondent had been in an abusive relationship for a very long time, and the abuse persisted despite the Department's intervention in 2017 and respondent-mother's participation in services.

During most of the lower-court proceeding, respondent-mother chose her relationship with respondent-father over the safety of her children. She continued to have contact with respondent-father in violation of the trial court's no-contact order and the PPO that she obtained against him and attempted to hide her contact with him from caseworkers and the trial court. At the termination hearing, caseworkers referred to respondent-mother's history of deceit about her contacts with respondent-father, and respondent-mother acknowledged that she had been dishonest regarding her continued relations with respondent-father. In August 2023, respondent-mother claimed that she had had enough of respondent-father's abuse, and that her "life was more important and [her] kids need[ed] their mom." Yet, respondents, along with KF, were seen together in a car a few months later in December 2023. In March 2024, respondent-mother was again in respondent-

father's car when he was pulled over for a traffic stop. On that occasion, respondent-mother had contacted respondent-father and asked him for a ride home from work. When the police asked her about her PPO against respondent-father, she claimed that she was unaware that it was still in place. Respondent-father maintained that she had withdrawn the PPO. Further, in May 2024, respondent-mother drove respondent-father to a gas station where, in the trial court's words, respondent-mother was "horribly beaten up" by him.

The trial court acknowledged respondent-mother's testimony that the gas station incident was pivotal for her. However, the court also pointed to evidence that did not align with respondent-mother's insistence that she could keep KF safe from the effects of domestic violence. The court stated that a transcript of the jail phone conversations between respondents on May 28, 2024, perhaps suggested that respondent-mother was not ready to give up respondent-father. Notably, respondent-mother could have refused to accept respondent-father's phone calls from the jail, but she chose to accept them. In addition, the court noted that respondent-mother's decision that she was finished with respondent-father coincided with the permanency plan changing from reunification to adoption. Further, the court observed that although respondent-mother claimed not to have had contact with respondent-father for six months, this may have been because respondent-father "just decided to let [respondent-mother] go." The court acknowledged that this was uncharacteristic of abusers, however, and expressed concern whether respondent-mother's resolve would last and what she might do if respondent-father tried to contact her. Respondent-mother's testimony in this regard was not encouraging. She insisted she was no longer scared of respondent-father, that he no longer controlled her, and that she no longer wanted to coparent with him. But, she stated that he had not tried to contact her and admitted that she did not know how she would react if he did.

The trial court understandably sympathized with the position in which respondent-mother found herself. Nevertheless, on the basis of the entire record, the court determined that respondent-mother had not yet sufficiently benefited from the counseling services provided. See *In re Atchley*, 341 Mich App 332, 339; 990 NW2d 685 (2022) (a respondent must not only participate in services, but also benefit from them). Further, we note that given the trial court's two decades of experience as a prosecutor, the court was particularly knowledgeable about the complexities and effects of domestic violence.

Considering the facts of this case, we cannot conclude that the trial court clearly erred by finding that clear and convincing evidence supported the termination of respondent-mother's parental rights under MCL 712A.19b(3)(c)(*i*). The record evidences the long-standing nature of the abuse between respondents, respondent-mother's untruthfulness and deceit throughout the case, and the extensive services respondent-mother received to address domestic violence. After more than 2½ years since the initial dispositional order, it was unclear whether respondent-mother would choose KF's safety over contact with respondent-father. Therefore, we cannot conclude that the trial court clearly erred by finding that the evidence supported terminating respondent-mother's parental rights to KF under MCL 712A.19b(3)(c)(*i*).

The Department was required to establish only one ground for termination. See MCL 712A.19b(3); *In re Gonzales/Martinez*, 310 Mich App 426, 431; 871 NW2d 868 (2015).

Therefore, we need not consider whether clear and convincing evidence established grounds for termination under MCL 712A.19b(3)(g) or MCL 712A.19b(3)(j).[3]

## III. BEST INTERESTS

Respondent-mother next contends that the trial court clearly erred by determining that termination was in KF's best interests. We review for clear error a trial court's determination that termination is in a child's best interests. *In re Trejo*, 462 Mich at 356-359. If the trial court finds "that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). In making its best-interest determination, a trial court may consider "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014) (quotation marks and citation omitted). The court may also consider "the parent's compliance with treatment plans, the child's well-being in care, and the possibility of adoption." *In re Sanborn*, 337 Mich App at 277. In making a best-interest determination, the focus is on the child, not the parent. *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016).

There was no dispute that KF and respondent-mother shared a bond, and respondent-mother's parenting skills were not in question. Weighing heaviest in the trial court's best-interest decision was KF's need for permanency, stability, and finality, and the advantages of the foster home over respondent-mother's home. The court recognized the trauma that KF endured as a result of her repeated exposure to domestic violence and her repeated removals and reunifications. KF's trauma assessment illustrated her extensive needs and the treatments she required. She lived in a specialized foster-care home that worked with children who had issues expressing themselves verbally in appropriate ways, and KF was receiving the therapy and support she needed. The court determined that respondent-mother, because of her own trauma and abuse, was not in a position to provide KF with the emotional stability and therapy she required. Moreover, KF shared a bond with her caregivers, liked living in her placement, and her caregivers were willing to care for her as long as necessary and, possibly, to adopt her. On the other hand, respondent-mother had not sufficiently benefited from her treatment plans, and, after more than two years of services, she was only just beginning to address the effects of domestic violence. In light of the foregoing, we are not left with a definite and firm conviction that the trial court clearly erred by determining that termination of respondent-mother's parental rights was in KF's best interests.

Affirmed.

/s/ Brock A. Swartzle
/s/ Kristina Robinson Garrett
/s/ Christopher P. Yates

---

[3] Nevertheless, having reviewed the record, we note that the trial court did not clearly err by finding that clear and convincing evidence supported the other statutory grounds as well.